494:36 LRA

CITY OF DETROIT *v.* BOARD OF WATER COMMISSIONERS.

1. DETROIT HOUSE OF CORRECTION—CHARACTER AND CONTROL OF.
    While the legislature has required the city of Detroit to pay
    the expenses of the Detroit House of Correction to the extent
    that they shall be found to exceed its earnings, the manage-
    ment and appropriations of said institution are not within
    the control of the common council, but are confided to
    officers provided for by the law, except as the assent and con-
    currence of the council is necessary to extraordinary appro-
    priations.

2. SAME—WATER SUPPLY—DUTY OF COMMISSIONERS.
    Whatever may be the duty of the board of water commissioners
    of the city of Detroit as to furnishing water for the general
    purposes of the city, it is under no obligation to furnish it
    gratuitously to the Detroit House of Correction.

*Certiorari* to Wayne; Lillibridge, J.   Submitted Jan-
uary 28, 1896.   Decided March 3, 1896.

*Mandamus* by the city of Detroit to compel the board
of water commissioners of said city to furnish water,
free of charge, to the Detroit House of Correction.   From
an order granting the writ, respondent brings *certiorari.*
Reversed.

*John J. Speed,* for relator.

*Henry M. Duffield,* for respondent.

HOOKER, J.   The city of Detroit, through its corpora-
tion counsel, asks a *mandamus* to compel the board of
water commissioners to furnish, free of charge, water to the
Detroit House of Correction.   The writ was granted by
the circuit court, and the respondent has brought the pro-
ceeding to this court by *certiorari.*

The Detroit House of Correction appears to have been
built by the city under a general power, given to the

common council, "to establish and build jails, work-
houses, and houses of correction for the confinement of
offenders; to erect, and provide for erecting, the necessary
buildings therefor, and control and regulate the same; to
appoint all necessary officers for -taking charge of the
same, and of persons confined therein; to prescribe their
powers and duties, and provide for their removal from
office, and the filling of vacancies." Sess. Laws 1857, p.
106, subd. 60. Other sections of the charter provide for
the confinement of state offenders, at the expense of the
State and the various counties, and subsequent statutes
took away much of the control originally given to the
council, and lodged it elsewhere. See 2 How. Stat. chap.
344.

The status of this institution has been before the courts,
and in the case of *City of Detroit* v. *Laughna*, 34 Mich.
402, this court said:

"The city, indeed, built the prison, and has an interest
in its finances, as it is responsible to a certain degree
for its expenses; but, after the house was built; under
provisions of the city charter, which may or may not
have been legally sufficient to provide for its future
management, the legislature, either discovering defects,
or, more probably, recognizing the manifest impropriety
of allowing a prison to be managed by a city council,
passed a statute which removed any doubt concerning
the legal position of that establishment. On the 15th
of March, 1861, an act was passed, entitled 'An act
to establish the Detroit House of Correction and authorize
the confinement of convicted persons therein.' By this
act, the government of the prison was put under the
control of a board of inspectors, of whom three were to
be appointed by the common council, on the nomination
of the mayor, and, in addition to these, the mayor and
the chairman of the board of state prison inspectors were
made *ex officio* members. The regulation and discipline
were to be under rules adopted by the board, leaving
the council no voice except concerning the approval of
rules relating to salaries and compensation of officers and
employés. There is no very important power which
the council can exercise without the concurrence of the

inspectors, except in the selection of the superintendent, whose powers and duties are all governed by the act of 1861 and the general laws of the State. Any interference whatever by the common council, either in the selection of inferior officers or in the internal management of the prison, would be unlawful and nugatory. While it has, at various times, in legal experience, been customary to allow, and sometimes to compel, prisons to be built and maintained by larger or smaller municipal corporations, yet all criminal prisons are and must be public, and not private, places of detention, and no imprisonment can be lawful that is not authorized by public laws. In England, it is settled that all prisons, by whomsoever kept, are the king's prisons (2 Inst. 100, 589; *Ex parte Evans*, 8 Term R. 172), and no new prison can be erected except by act of parliament."

We find, therefore, that, while the legislature has required the city to pay the expenses of the house of correction to the extent that they shall be found to exceed the earnings, its management and its appropriations are not within the control of the council, these being confided to officers provided for by the law, except as the assent and concurrence of the council is necessary to extraordinary appropriations, etc.

The board of water commissioners is a corporation, created in the year 1853, by act of the legislature, and given the charge of the waterworks, which it is authorized to manage and extend, and to regulate, and fix and collect, water rates from the owner or occupant of each house or other building having or using water. Laws 1853, p. 180; 3 Laws 1873, p. 137. These water rates seem to be the only source of revenue provided for the running expenses of the waterworks. *Jones* v. *Water Commissioners*, 34 Mich. 273. Extensions, etc., are provided for from other sources, and fire hydrants may be ordered by the fire commissioners, in which case they must be paid for from the funds of the fire commission. If required by the council, it must pay the expense.

It is now contended that the house of correction belongs to the city, and is a public institution, and, as such, is en-

titled to be supplied with water free of charge.   It is a significant fact that those having in charge the management of the house of correction do not make this application, and that the city is the moving party.   As already shown, the city must provide for the expenses of this institution, so far as they are not covered by the earnings. Such expense, then, should be a burden upon the whole body of taxpayers of the city.   If the water must be paid for, it must come out of the general tax, unless it can be paid from the earnings.   On the other hand, if the institution is entitled to have the water furnished gratuitously by the commissioners, the burden is not borne by the city at large, but by those only who are private consumers of water.   The fund derived from water rates is depleted to that extent, and it might easily be so seriously affected as to require a raising of the rates.   If, as contended, the water commissioners cannot refuse to furnish water gratuitously to this institution, they have practically no alternative but to furnish what is required, nor have they any means of preventing wastefulness, or the extension of its use to many purposes to which steam or other power is now applied.   The common council would be powerless to control it.   The house of correction should be supported from its own fund, and if, as is reported, it produces a handsome balance over expenditures each year, it should not be permitted to increase such amount by compelling the water board to use a part of its income from water rates; and we can see no difference between requiring the water board to pay a sum of money directly to the management of the institution, and expending it for water to be furnished.

It is said that there is no merit in the defense, that it is merely a matter of bookkeeping, and that what is paid for water is taken from one city pocket and put into another; but we have shown that this is not true, inasmuch as one fund must be furnished by the city at large, or, possibly, by the county of Wayne and other counties, or

the State at large, while the other is made up by a comparatively small portion of the inhabitants of the city, *i. e.*, those who pay water rates. Again, if this were a mere matter of bookkeeping in the sense contended for, its natural tendency would be towards an economical use of water by the institution. It is probable that the board of water commissioners was created for the frugal and economical management of the waterworks, and the conduct of the business connected therewith, and that it could not have been intended that it should be at the mercy of every institution that may be called public. Whatever may be its duty as to furnishing water for the general purposes of the city, we think that it is not under an obligation to furnish it to this institution without pay.

We think the order of the circuit court granting the writ should be reversed.

The other Justices concurred.